**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

UNITED STATES OF AMERICA,

               Plaintiff,

    v.

JOSEPH BRODIE,

               Defendant.

Crim. No. 1:18-cr-0162-NLH-1

**OPINION**

---

APPEARANCES:

Philip R. Sellinger, United States Attorney
Sara Aliya Aliabadi, Assistant United States Attorney
U.S. Attorney's Office for the District of New Jersey
401 Market Street - P.O. Box 2098
Camden, NJ 08101

    *Attorneys for the United States of America*

Joseph Brodie
121 Washington Street
West Pittston, PA 18643

    *Defendant Pro se*

<u>HILLMAN</u>, District Judge

Defendant Joseph Brodie ("Defendant") is proceeding *pro se* on a Motion to Modify the Conditions of his Supervised Release Term.  More specifically, he seeks to be relieved of a computer-monitoring special condition of that release.  (ECF 201).  The Government opposes the motion.  (ECF 203).  The Defendant filed a reply in further support of his Motion.  (ECF 204).

1

In addition, Defendant filed a Motion to Terminate Supervised Release.  (ECF 205).  The Government opposes this motion as well.  (ECF 207).  Defendant filed a reply.  (ECF 208)

For the reasons below, the Court will deny both motions.

## I.   BACKGROUND

Defendant was convicted of two counts of threatening to assault and murder a United States congressman, 18 U.S.C. §§ 115(a)(1)(B) and (b)(4) (2018).  The Court adopts and recites the facts underlying Defendant's federal convictions as stated by the United States Court of Appeals for the Third Circuit in its opinion denying Defendant's direct appeal:

> Brodie is a decorated war veteran who served in both the United States Marine Corps and the Army.  In 2003, Brodie was seriously wounded while serving as a machine gunner in Iraq.  He suffered a traumatic brain injury, seizure disorder, hearing damage, migraines, and post-traumatic stress disorder.  These conditions require ongoing medical care.  When Brodie later moved to New Jersey in 2017, he encountered multiple obstacles in receiving care from the Veteran's Health Administration and Veteran's Benefits Administration (collectively, the "VA").
>
> Brodie learned that New Jersey Congressman Frank LoBiondo was an advocate for veterans, and he contacted the Congressman's office for assistance.  The Congressman's staffer and veterans' liaison Michael Francis was tasked with aiding Brodie.  The pair spoke regularly, but the relationship steadily declined.  In September 2017, Brodie made various threats to Francis and others through e-mails and a phone call.  At one point, Brodie sent an e-mail asking for a face-to-face meeting with Congressman LoBiondo, attaching a Google Earth image showing the location of the Congressman's office.  That same evening, Brodie told his fiancée [Dana Mednick] that he wanted to die in a gun fight.  He also

> admitted to threatening the life of the Congressman's
> Chief of Staff, Jason Galanes, and stated he was not
> "going down without a fight." Concerned, his fiancée
> asked the New Jersey state police to perform a welfare
> check on Brodie.
>
> The state troopers arrived at Brodie's residence.
> Brodie exited his home with a firearm in hand. He
> explained that he did not want to shoot the officers,
> and instead, put the firearm into his own mouth, sank to
> his knees, and pulled the trigger. Twice the weapon
> failed to discharge. At that point, Brodie surrendered.
> He was taken into custody, read his <u>Miranda</u> rights, and
> eventually given a mental health evaluation. Several
> days later, Brodie was interviewed by the FBI. He was
> again read his <u>Miranda</u> rights, at which point he executed
> a written waiver of those rights. Brodie gave an
> inculpatory statement during the interview.

<u>United States v. Brodie</u>, 824 F. App'x 117, 119 (3d Cir. 2020)

(footnote omitted).

As set forth in detail in the Government opposition to the
pending motion, Defendant's threats directed at the Congressman
and his staff, made through telephone calls and emails with
attachments downloaded from the internet, followed similar
threatening e-mails and other communications to the employees of
the Veterans Administration, the original source of Defendant's
anger toward the government. (ECF 203). The Court appointed
Thomas Young, an assistant federal public defender, to represent
Defendant. (ECF 5).[1] Ralph Jacobs, Esq. was later substituted
as counsel and filed several motions on Defendant's behalf,

---

[1] Defendant was represented by several different counsel during
the criminal case. The Court refers to the attorneys by their
names for clarity's sake.

including motions for release, bail review, motions to suppress evidence, and a motion to suppress Defendant's statement.  (ECF 13, 17, 34, 38, 73, 77).  Magistrate Judge Joel Schneider denied Defendant's motion for release from custody.  (ECF 25).

This Court heard oral argument on Defendant's suppression motions over several dates, hearing testimony from Defendant, his fiancé Dana Mednick, and several law enforcement officers. July 6, 2018 Hr'g Tr., (ECF 54); July 16, 2018 Hr'g Tr., (ECF 57); July 26, 2018 Hr'g Tr., (ECF 58); and Aug. 27, 2018 Hr'g Tr., (ECF 68).  The Court concluded that the United States had satisfied its burden and denied Petitioner's motion to suppress his statement.  (ECF 67, 86).  It found that Defendant was not in custody when officers arrived at his residence.  The Court further concluded that Defendant's statement to the FBI did not occur after an invocation of his Fifth Amendment right to counsel.  Aug. 27, 2018 Hr'g Tr. at 13:7-12 (ECF 68).  See also (ECF 67) (Order denying and dismissing defense motions).

Defendant withdrew his motion challenging the validity of the federal search warrants on his cellular devices after the parties agreed to have the FBI produce the phones to Cornerstone Discovery, a third-party vendor selected by Defendant, "to download the contents of the devices and give copies of those downloads to the defense."  (ECF 52) (Order documenting procedure).

Trial began on October 1, 2018, ending in Defendant's conviction on October 10, 2018.  (ECF 103).  Defendant testified on his own behalf.  Jacobs filed motions for a directed verdict and new trial on October 31, 2018.  (ECF 109).  The Court held oral argument on January 14, 2019 and denied the motions on the record.  (ECF 123).  The Court appointed Defendant new counsel at his request, naming Paul Sarmousakis, Esq. on March 27, 2019.  (ECF 125).  Defendant again sought new counsel on June 6, 2019.  (ECF 128).  The Court appointed Gina Amoriello, Esq.  (ECF 136).

Amoriello filed a motion for a new trial under Federal Rule of Criminal Procedure 33 on October 22, 2019.  (ECF 167).  The motion alleged Defendant had received photographs taken during the search at his residence, "as well as fax records that confirm that Mr. Brodie faxed documentation to the State Police on prior occasions," from the attorney representing him in related state court proceedings.  (Id. at 3).  Defendant alleged these items corroborated his testimony but had been withheld by the United States.  (Id. at 4).

The motion further argued that Defendant had "received a hard-drive from [Amoriello] which included any and all evidence provided to her in his federal case, from all prior counsel as well as the Government" and  "[u]pon review of the hard-drive discovery, Mr. Brodie saw (for the first time) an FBI Extraction Report dated June 4, 2018 (before the Motions hearing) . . . ."

(Id. at 3).  According to the motion, the hard drive included
calls between Petitioner and Michael Francis that were not
reflected on the AT&T bill that had been produced by the U.S
House of Representatives.  (Id. at 4).  "The defense contends
that the delay in turning over this extraction (which had the
evidence of calls being made), whether a mistake, oversight, or
intentional, amounts to prosecutorial misconduct by denying
[Defendant] his right to potentially exculpatory impeachment
evidence regarding the existence of calls prior to his testimony
at the motions hearing."  (Id.).  The Court denied the motion on
November 19, 2019.  (ECF 176).

The Court sentenced Petitioner to a total term of 87 months
imprisonment followed by a three-year supervised release period
on December 23, 2019.  (ECF 178).  Defendant appealed, and the
Third Circuit affirmed the convictions and sentence.  Brodie,
824 F. App'x at 119.

Defendant filed his original § 2255 motion on September 14,
2020.  Brodie v. United States, 1:20-cv-12713-NLH [hereinafter,
Civ. Case] (ECF 1).  The Court sua sponte appointed counsel to
represent Defendant and ordered counsel to submit an amended
motion.  (Civ. Case, ECF 2).  Shortly thereafter, Defendant
moved to terminate the appointment of counsel and proceed *pro
se*.  (Civ. Case, ECF 16).  Defendant submitted an amended *pro se*
motion.  (Civ. Case, ECF 20).  The Court granted the motion to

6

proceed *pro se* and permitted counsel to withdraw from
representation.  (Civ. Case, ECF 22).  The Court also advised
Defendant of his rights under United States v. Miller, 197 F.3d
644 (3d Cir. 1999).  (Id. at 3).  Defendant responded that he
wished to proceed with his amended motion as filed (Civ. Case,
ECF 23), and the Court directed the United States to answer the
amended motion (Civ. Case, ECF 25).

On May 10, 2022, Defendant filed a Petition for Habeas
Corpus pursuant to 28 U.S.C. § 2241 in the Southern District of
New York.  Brodie v. Pliler, 1:22-cv-3821-LGS [hereinafter,
"SDNY Case"].  Defendant sought the calculation and application
of additional First Step Act Time Credits.  (SDNY Case, ECF 1).
On July 11, 2022, applying 345 days of FSA Time Credits,
Defendant was transferred to prerelease custody.  (SDNY Case,
ECF 12 at 5).  On November 7, 2022, the Honorable Lorna G.
Schofield issued an Opinion and Order requiring the BOP to
calculate any additional time credit and file a letter once
complete.  (SDNY Case, ECF 18 at 7).

On November 21, 2022, Defendant filed an Emergency Motion
again seeking application of additional time credits.  (SDNY
Case, ECF 22).  On November 28, 2022, the Government filed a
letter advising that it had calculated the additional FSA Time
Credits, and would transfer Defendant from prerelease custody to
supervised release twenty days earlier than planned.  (SDNY

7

Case, ECF 23).  Accordingly, the Court denied Brodie's November
21, 2022 motion as moot and closed the case.  (SDNY Case, ECF
25, 26).

On December 20, 2022, Defendant began his term of
supervised release.  (Civ. Case, ECF 56-3 at 1).  Defendant is
scheduled to remain on supervised release for three years,
ending on December 19, 2025.  (Id.; ECF 203 at 7; ECF 207 at 8).

On December 20, 2022, Defendant filed a motion to "Amend/
Suspend/ Terminate the conditions of his supervised release
pending the Court's ruling to VACATE his conviction . . . ."
(Civ. Case, ECF 56).  On January 22, 2023, he filed a motion for
an entry of default based on the United States' lack of response
to his motion.  (Civ. Case, ECF 57).  On January 24, 2023, he
filed a motion for sanctions based on "successive, unanswered,
meritorious Motions demonstrative of the types of criminal
actions and misconduct unbecoming of an agent of the Court and
expressly prohibited in The Federal Rules of Criminal & Civil
Procedure . . . ."  (Civ. Case, ECF 58).

On July 7, 2023, the Court dismissed portions of the
amended motion as procedurally barred and denied the rest of
Defendant's arguments.  (Civ. Case, ECF 72).  The Court also
declined to issue a certificate of appealability.  (Id.).
Petitioner subsequently filed a motion for reconsideration (Civ.
Case, ECF 73); a motion for a certificate of appealability (Civ.

Case, ECF 74); and a notice of appeal (Civ. Case, ECF 75).  See also Brodie v. United States, Appeal No. 23-2250 (3d Cir.).  On September 15, 2023, this Court denied the motion for reconsideration and motion for certificate of appealability. (Civ. Case, ECF 83).

On March 29, 2023, in his criminal case, Defendant filed a Motion to Modify the Conditions of his Supervised Release.  (ECF 201).  On May 19, 2023, the Government filed its Response.  (ECF 203).  Defendant filed his Reply on May 20, 2023.  (ECF 204). Then, on October 31, 2023, Defendant filed a Motion to Terminate Supervised Release.  (ECF 205).  On December 21, 2023, the Government filed its Response.  (ECF 207).  On December 21, 2023, Defendant filed his Reply.  (ECF 208).

## II.  STANDARD OF REVIEW

Modification and termination of supervised release are governed by 18 U.S.C. § 3583(e).  The statute provides, in relevant part:

> The court may, after considering the factors set forth in [18 U.S.C. §] 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7)--
>
> (1) terminate a term of supervised release and discharge the defendant released at any time after the expiration of one year of supervised release, pursuant to the provisions of the Federal Rules of Criminal Procedure relating to the modification of probation, if it is satisfied that such action is warranted by the conduct of the

> defendant released and the interest of
> justice;
>
> (2) extend a term of supervised release if
> less than the maximum authorized term was
> previously imposed, and may modify, reduce,
> or enlarge the conditions of supervised
> release, at any time prior to the expiration
> or termination of the term of supervised
> release, pursuant to the provisions of the
> Federal Rules of Criminal Procedure relating
> to the modification of probation and the
> provisions applicable to the initial setting
> of the terms and conditions of post-release
> supervision . . .

18 U.S.C. § 3583(e)(1)-(2).

Early termination should be granted "only if [the Court] is satisfied that early termination is warranted by the defendant's conduct and is in the interest of justice." United States v. Melvin, 978 F.3d 49, 52 (3d Cir. 2020) (citing 18 U.S.C. § 3583(e)(1)). It is Defendant's burden, "as the party receiving the benefit of early termination, to demonstrate that such a course of action is justified." United States v. Weber, 451 F.3d 552, 559 n.9 (9th Cir. 2006). The Court's decision is discretionary after examination of the record as a whole and consideration of the relevant statutory factors. Melvin, 978 F.3d at 52 ("The expansive phrases 'conduct of the defendant' and 'interest of justice' make clear that a district court enjoys discretion to consider a wide range of circumstances when determining whether to grant early termination.") (citation omitted).

Further, in exercising its discretion, "a district court need not find that an exceptional, extraordinary, new, or unforeseen circumstance warrants early termination of a term of supervised release before granting a motion under 18 U.S.C. § 3583(e)(1)." Id.  Nonetheless, while such factors are not required "if a sentence was 'sufficient, but not greater than necessary' when first pronounced," as § 3553(a) requires, a reviewing court would generally "expect that something will have changed in the interim that would justify an early end to a term of supervised release."  Id. at 53.

Like motions to terminate supervised release, motions to modify conditions of supervised release are governed by the § 3583(a) factors.  United States v. Rosiere, 711 F. App'x 76, 79 (3d Cir. 2017).  Similarly, "[t]here is no restriction in 18 U.S.C. § 3583(e)(2) requiring a district court to make findings of changed circumstances in order to modify conditions of supervised release."  United States v. Murray, No. 11-51, 2011 WL 2712987, at *4 (W.D. Pa. July 11, 2011).  Like early termination, the decision to modify conditions of supervised release is discretionary.  United States v. Roebuck, 761 F. App'x 98, 103 (3d Cir. 2019) ("A district court has broad discretion to impose special conditions on supervised release or modify its terms.").

11

Taking into consideration both Defendant's conduct and the interest of justice, the Court concurs with the Government that neither modification of the conditions of his release nor early termination of supervised release is warranted.

**III. DISCUSSION**

This Court will first address Defendant's Motion for Modification of the Conditions of Supervised Release, and then will address the Motion for Early Termination.

### a. The Relevant § 3553(a) Factors Weigh Against Modification of the Conditions of Supervised Release

First, the condition that Defendant seeks to modify is the condition of his release that requires computer monitoring. This condition states as follows:

> COMPUTER MONITORING
>
> You must submit to an initial inspection by the U.S. Probation Office, and to any unannounced examinations during supervision, of your computer equipment.  This includes, but is not limited to, personal computers, personal digital assistants, entertainment consoles, cellular telephones, and/or any electronic media device which is owned or accessed by you. You must allow the installation on your computer of any hardware or software systems which monitor computer use. You must pay the cost of the computer monitoring program.  You must abide by the standard conditions of computer monitoring. Any dispute as to the applicability of this condition will be decided by the Court.

(ECF 178 at 3).

12

Defendant supports his request by explaining that "his electronic devices have (inexplicably) frozen and malfunctioned when attempting to submit filings to the Court." (ECF 201 at ¶ 4). Defendant details further technical issues, including that "all of his online financial transactions have been impeded and rejected due to security certificate issues stemming from the software installed on his devices"; "his cellular telephone has frozen" and he has "been locked out for prolonged periods of time"; and "files related to his publishing contract and a book he is writing regarding his malicious prosecution and wrongful imprisonment have been accessed by the monitoring software." (Id. at ¶¶ 8-9, 13). While he avers that the United States Parole and Probation Office "have informed him of past issues with the monitoring software," he also states that following "appointments to resolve the technical issues . . . the government denied that their monitoring software was the source of the problems." (Id. at ¶¶ 6-7).

Defendant avers that the monitoring acts as a "'backdoor' for the United States to [improperly] access evidence relevant to an open civil action." (Id. at ¶ 14) (bracketed content in original). He claims that the Government utilizes the continued monitoring "to violate his attorney privilege." (Id. at ¶ 20). He claims that through the electronic monitoring "his electronic

devices are subject to remote control by government proxies."
(Id. at ¶ 5).

Defendant proposes continued monitoring through "random
inspections that are not being continuously uploaded, recorded,
and stored."  (Id. at ¶ 16).  Defendant claims that "that to
deny this Motion while such a viable alternative exists would be
demonstrative of bias and prejudice against the Petitioner by
this Court."  (Id. at ¶ 24).  The Government responds that
"Brodie has not shown that his computer monitoring condition is
excessive, in light of the facts and circumstances of his case,
and therefore Brodie's motion should be denied."  (ECF 203 at
1).  Resolution of Brodie's motion requires the Court to assess
the relevant § 3553(a) factors.

Considering the nature and circumstances of the offense,
Defendant utilized electronic devices, including a phone and
computer, to communicate threats of murder to a Congressman and
his staff.  Defendant also utilized electronic devices to
determine the location of this Congressman's office, sending a
map of the location along with his threating statements.  These
factors have a direct bearing on the purpose of computer
monitoring as a condition of Defendant's supervised release, as
electronic devices were used to carry out the underlying crime.

Defendant argues, "[t]he circumstances and nature of the
case have not been presented in full before this Court as I have

14

never received the contents of my cellular device as ordered in
Document 52 signed July 16, 2018.  I argue there is exculpatory
and impeachment evidence in that device that would alter the
totality of events and perception by this Court."  (ECF 204 at
3).  Defendant's refusal to acknowledge that the crime his jury
found he committed was accomplished through the use of computer
equipment further suggests to the Court that continued computer
monitoring is appropriate.

　　With respect to the history and characteristics of the
Defendant, Defendant points to his "model inmate history" and
reintegration into society as he is "involved in various social
groups, attend[s] religious services, and participate[s] in
veteran's groups and various charities."  (Id. at 2).  He also
explains that he "continue[s] to meet all treatment
requirements."  (Id.).  Defendant argues that his "current
status and prognosis is exceptional and positive" and that
"[p]revious psychosocial stresses have been alleviated as [he]
receive[s] [his] medical care in the community and the Veterans
Health Administration (VHA) has implemented a process for paying
their bills since my last involvement with their previous
system."  (Id. at 3).

　　While Brodie's compliance with the terms of his
incarceration and supervised release, and his community
involvement, are relevant factors, the Court expects defendants

to seek meaningful community connections and to be good citizens upon their return to society.  As one court has noted, if that were enough and every formerly incarcerated defendant who satisfied all the conditions of her or her release received early termination, the exception would swallow the rule.  United States v. Guilliatt, No. 01-408, 2005 WL 589354, at *1 (E.D. Pa. 2005); see also United States v. Lohman, Case No. 02-CR-219, 2007 WL 1430282, at *1 (E.D. Wis. 2007) (holding that if simple compliance were sufficient for early termination, "every defendant who avoided revocation would be eligible for early termination."). Here, Brodie's achievements, while positive, are insufficient alone to merit modification of his conditions of supervised release.

Moreover, Brodie's briefing includes allegations that demonstrate the continued need for monitoring.  Defendant's underlying conviction stemmed from paranoid thought patterns that government officials and employees, namely the Congressman and his staff, were working against him.  Similarly, in his Motion Defendant alleges that "his electronic devices are subject to remote control by government proxies" and that the Government is using the monitoring as a "backdoor" to illegally obtain evidence.  (ECF 201 at ¶¶ 5, 14).  Then, in his Reply, Defendant reiterates claims that his "conviction was acquired through deliberately altered federal records."  (ECF 204 at 1).

These allegations demonstrate that the Defendant continues to demonstrate the same characteristics of delusional thought and unsubstantiated mistrust of the Government that led to his offense and conviction and the imposition of the monitoring condition of his supervised release in the first place.  Far from demonstrating the computer condition is unwarranted, Defendant's motion evidences a continuing justification and need for it.  See 18 U.S.C. § 3553(a)(1).

Considering the need for the sentence imposed to afford adequate deterrence, 18 U.S.C. § 3553(a)(2)(B), continuation of the electronic monitoring provides specific deterrence against additional criminal conduct, as the purpose of the electronic monitoring is to monitor for similar behaviors.  The knowledge that his computer use is being monitored may deter Defendant from engaging in repeat behavior.  See United States v. Nestor, 678 F. App'x 73, 76 (3d Cir. 2017) (acknowledging the relationship between a computer monitoring condition and "goals of deterrence and public safety").  Similarly, to the extent the monitoring does, in fact, have a deterrent effect, the monitoring also protects the public from further crimes of the defendant.  See 18 U.S.C. § 3553(a)(2)(C).

In assessing the types of sentences and conditions available, 18 U.S.C. § 3553(a)(3), Defendant asserts that there is a "less restrictive" option available that will achieve the

same goals.  (ECF 204 at 3).  He asks the Court to impose random
inspections of his electronic devices instead.  (ECF 201 at ¶
16).  First, the Court notes that the possibility of random
inspections is already a part of the computer monitoring
condition in place.  (ECF 178 at 3) ("You must submit to an
initial inspection by the U.S. Probation Office, and to any
unannounced examinations during supervision, of your computer
equipment.").  Thus, Defendant does not truly present an
alternative, but instead merely requests a limitation on the
current condition.  Moreover, at the time of sentencing, in
imposing a sentence that was sufficient, but not greater than
necessary, this Court determined that "since a computer was used
for the offense" this condition would be imposed.  December 19,
2019 Hr'g Tr. at 223:18-22 (ECF 189).  Defendant has failed to
persuade the Court that this condition is no longer necessary.

    Further, while the alternative that Defendant proposes is a
less stringent type of monitoring, thus not providing the same
protections as the present condition, this Court is not
convinced that the proposed condition would allay Defendant's
concerns.  First, this Court has no reason to believe that
Defendant's technical issues with his computer while sending
email or using banking platforms has any connection to the
monitoring software, as Defendant has explained that he inquired
into this issue, had the Government look into it, and was

18

advised that the software was not the cause of the technical
issues.  Insofar as Defendant's concern is that the Government
using the monitoring to access privileged information from his
computer — an allegation that this Court does not credit as
there is no support in the record for it — this Court expects
that Defendant would remain concerned about the Government's
access while they performed random inspections as well.

In assessing potential sentencing disparities, 18 U.S.C. §
3553(a)(6), Defendant asserts that he was subject to sentencing
disparities because "**individuals who participated in January 6,
2021 capitol riots, i.e., ACTUAL PHYSICAL VIOLENCE**" received
lesser sentences.  (ECF 204 at 3) (emphasis in original).
Defendant does not point to any specific cases or criminal
histories in support of this conclusory allegation.  Instead, he
rhetorically "ask[s] if the government can shoulder the burden
of demonstrating that all of the individuals who were in
Washington, D.C. on January 6th, 2021, that used their cellular
phones to simply take pictures, text loved ones, friends, bus-
trip co-travelers, or emailed any of these had monitoring
software placed on ALL of their phones?"  (Id.).

However, it is Defendant's burden to support his argument
that his conditions of release should be modified.  Defendant
did not present information demonstrating that these alleged
defendants actually received lesser sentences, did not present

19

clear parallels between these unnamed defendants' use and Brodie's use of electronic devices in the commission of their respective offenses, and did not point to parallel criminal histories.  As such, Defendant has not demonstrated a sentencing disparity.

On the other hand, Courts have imposed similar and more stringent conditions for other defendants that have committed offenses through use of electronic devices.  See, e.g., United States v. Martino, No. 19-3769, 827 F. App'x 218 (3d Cir. Sept. 15, 2020) (upholding this Court's imposition of a condition of supervised release that prohibited defendant from using the internet entirely after he continued to utilize electronics to make death threats, lie to his probation officer, and harass his girlfriend all while subject to a computer monitoring condition).

Overall, Defendant has not carried his burden of demonstrating that his computer monitoring condition of release should be modified.  None of the factors argued in Defendant's briefing nor examined above support modification.  This Motion will be denied.

### b. First Step Act Time Credits Do Not Provide a Basis for Early Termination

In support of his Motion for Early Termination, Defendant states that he has accrued "no less than 150 days (or five

months) of credits to be applied to Supervised Release."  (ECF 205 at ¶ 27).  Defendant explains that he sought relief in the United States District Court for the Southern District of New York related to application of his First Step Act (FSA) Time Credits.  (Id. at ¶ 5).  He avers that the Honorable Lorna G. Schneider "ruled Mr. Brodie earned the maximum 365 FTC" and that she "deferred to the jurisdiction of the sentencing court for the application of post release time credits earned."  (Id. at ¶¶ 8, 10, 15).

This Court has reviewed the Southern District of New York docket and will summarize pertinent details.  On May 10, 2022, while in federal custody at FCI Otisville, Defendant filed a Petition for Habeas Corpus seeking application of additional FSA Time Credits.  (SDNY Case, ECF 1).  While the Bureau of Prisons had calculated that Brodie had earned 345 FSA Time Credits, he asserted he qualified for the full statutory maximum of 365 days of Time Credits and thus an additional twenty should be applied. (Id.).  On July 11, 2022, applying 345 days of FSA Time Credits, Brodie was transferred to prerelease custody, specifically home confinement.  (SDNY Case, ECF 12 at 5).

On November 7, 2022, the Honorable Lorna G. Schofield issued an Opinion and Order requiring the BOP to "calculate manually any additional FSA Time Credits to which Petitioner is entitled pursuant to the FSA and the Rule."  (SDNY Case, ECF 18

21

at 7).  However, the Court held that "Respondent [Warden William
S. Pliler] will retain discretion to transfer him to supervised
release or maintain Petitioner's current placement in home
confinement, and it is reasonable to exercise that discretion
with a view toward ensuring predictable and orderly release
dates."  (Id.).

On November 21, 2022, Brodie filed an Emergency Motion
seeking application of 365 Federal Time Credits and "immediate
release on or after November 28, 2022."  (SDNY Case, ECF 22).
On November 28, 2022, the Government filed a letter advising
that it had calculated the additional FSA Time Credits, and
would exercise its discretion to transfer Brodie from prerelease
custody to supervised release twenty days early, applying the
remaining twenty days and bringing Brodie's total to the
statutory maximum of 365 days of FSA Time Credits.  (SDNY Case,
ECF 23).  Accordingly, the Court denied Brodie's November 21,
2022 motion as moot and closed the case.  (SDNY Case, ECF 25,
26).

Brodie's argument that additional FSA Time Credits should
be applied to shorten his period of supervised release lacks
merit for three reasons.  First, Brodie has already received the
maximum amount of FSA Time Credits.  Second, a recalculation of
sentence is properly filed under 28 U.S.C. § 2241, not as a

Motion for Early Termination.  Third, FSA Time Credits are not applicable to shorten a period of supervised release.

Contrary to Brodie's representation, application of additional time credits was not "deferred to the jurisdiction of the sentencing court."  (ECF 205 at ¶ 15).  The Court in the Southern District of New York found that the statutory maximum amount of Time Credits had been granted, providing Brodie with his requested relief.  (SDNY Case, ECF 25).  As the statutory maximum amount of FSA Time Credits has already been applied, Brodie is not entitled to application of any additional time credits.

Next, a challenge to the application of FSA Time Credits is properly brought as a habeas corpus petition under 28 U.S.C. § 2241.  Moody v. Gubbiotti, No. 21-12004, 2022 WL 4976308, at *1 (D.N.J. Oct. 3, 2022) ("Petitioner's claim that he is entitled to earlier supervised release upon application of his earned TCs is properly brought under § 2241 because he presents a challenge to the duration of his confinement.").  Thus, Defendant improperly seeks application of Time Credits as part of his motion for early termination of supervised release.  This is not the appropriate mechanism for this request.

Finally, application of FSA Time Credits to terminate a period of supervised release early is unsupported by the FSA. Defendant seeks application for FSA Time Credits to shorten his

23

time on supervised release.  The Government explains that while
"[a]t first blush, Brodie's argument might appear grounded in
principles of statutory construction, as the word 'shall'
theoretically could be read as mandatory language requiring the
application of credits to shorten a term of supervision. . . .
federal courts focus on the word 'toward' in the statute and
hold that when time credits are applied 'toward' supervised
release, it means they are applied to hasten the commencement of
the term of supervision, not to shorten the term of supervision
itself."  (Id. at 10) (citations omitted).

The statutory language at issue states as follows:

> **(C) Application of time credits toward
> prerelease custody or supervised release.**--
> Time credits earned under this paragraph by
> prisoners who successfully participate in
> recidivism reduction programs or productive
> activities shall be applied toward time in
> prerelease custody or supervised release.
> The Director of the Bureau of Prisons shall
> transfer eligible prisoners, as determined
> under section 3624(g), into prerelease
> custody or supervised release.

18 U.S.C.A. § 3632(d)(4).

It is true that application of earned time credits, for
eligible defendants, is mandatory, as prescribed by use of the
word "shall" in this statute.  Ramirez, v. Phillips, et al., No.
23-02911, 2023 WL 8878993, at *4 (E.D. Cal. Dec. 22, 2023) ("The
court notes, while granting FTCs to eligible prisoners is
mandatory, the government is correct that under § 3632(d)(4)(C),

24

it is within the BOP's discretion to apply FTCs toward either prerelease custody or supervised release. 18 U.S.C. § 3632(d)(4)(C). . . .  In other words, while the BOP has discretion to determine the form of release, transfer to a non-prison setting is mandatory for eligible prisoners.").  However, the question remains whether the mandatory time credit may be applied only to periods of imprisonment or may also be applied to periods of prerelease custody and supervised release.

Addressing this question, Courts have interpreted the word "towards" as meaning that the mandatory earned time credits are applied to reduce a term of imprisonment and therefore expedite the date prerelease custody or supervised release begins. United States v. Calabrese, No. 11-00437, 2023 WL 1969753, at *2 (N.D. Ohio Feb. 13, 2023) ("Use of the word 'toward' means that credits can be applied to bring 'time in prerelease custody or supervised release' closer to occurring because credits applied 'toward' something generally means to bring that something closer to happening.") (citing Black's Law Dictionary (11th ed. 2019)); See also Gallo v. Ortiz, No. 20-16416, 2021 WL 571600, at *4 (D.N.J. Feb. 16, 2021) ("Pursuant to 18 U.S.C. § 3624(g)(1)(A), a prisoner who 'has earned time credits under the risk and needs assessment system ... in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment' may be released to a residential reentry center ('RRC'), home

confinement or supervised release, subject to the provisions under § 3624(g)(1)(B-D) and (g)(2, 3).").

Next, the statutory language in dispute states that earned time credits "shall be applied toward time in *prerelease custody or supervised release*." 18 U.S.C.A. § 3632(d)(4)(C) (emphasis added). It does not include the term of imprisonment in this language. It is undisputed that earned time credits may be applied to reduce the term of imprisonment. Thus, the fact that this language does not state that the credits shall be applied toward imprisonment, prerelease custody, or supervised release supports the alternative reading of the word "toward" as meaning that the application of the time credits may accelerate the time prerelease custody or supervised release commences, rather than reducing the time while on prerelease custody or supervised release. "[R]eading 'toward time in prerelease custody or supervised release' to mean FSA credits shall reduce the overall terms of either prerelease custody or supervised release would write out any mechanism in the statute for FSA credits to reduce an eligible prisoner's time in custody in prison, which is the intended incentive behind the FSA time credits." Calabrese, 2023 WL 1969753, at *3.

This interpretation is consistent with the statutory language in surrounding sections of the Criminal Code. For example, § 3632 uses this same language:

26

> **(C) Application of time credits toward**
> **prerelease custody or supervised release.**--
> Time credits earned under this paragraph by
> prisoners who successfully participate in
> recidivism reduction programs or productive
> activities shall be applied toward time in
> prerelease custody or supervised release.
> The Director of the Bureau of Prisons shall
> transfer eligible prisoners, as determined
> under section 3624(g), into prerelease
> custody or supervised release.

18 U.S.C.A. § 3632.  The second sentence, describing the next

step once the time credits are applied, validates the

interpretation of "toward" as meaning to bring about prerelease

custody or supervised release sooner.

This interpretation is also consistent with understandings

of the purpose of prison terms and supervised release terms, as

explained by the Supreme Court.  Prison terms and supervised

release terms "are not interchangeable."  United States v.

Johnson, 529 U.S. 53, 59 (2000).  The Supreme Court has

explained that "[t]he objectives of supervised release would be

unfulfilled if excess prison time were to offset and reduce

terms of supervised release.  Congress intended supervised

release to assist individuals in their transition to community

life.  Supervised release fulfills rehabilitative ends, distinct

from those served by incarceration."  Id.

Finally, this Court notes that multiple courts have

similarly rejected requests to apply time credits to periods of

supervised release.  Hajati v. Spaulding, No. 22-00282, 2022 WL

27

21757147, at *2 (M.D. Pa. Aug. 22, 2022) ("As for Petitioner's stance that the Court should apply his earned time credits to his term of supervised release, that argument has already been considered and rejected by this Court."); Stewart v. Colette Peters, et al., No. 23-21, 2023 WL 8856148, at *2 (S.D. Miss. Dec. 4, 2023), report and recommendation adopted sub nom. Stewart v. Peters, No. 23-21, 2023 WL 8852747 (S.D. Miss. Dec. 21, 2023) ("even if the BOP failed to properly apply [Defendant's] earned-time credits to his sentence before he was released from prison, the FSA does not allow the earned-time credits to be applied to his term of supervised release."); Orasco v. Yates, No. 22-156, 2022 WL 18027627, at *3 n.4 (E.D. Ark. Dec. 12, 2022) ("And while the ETC program permits early transfer to supervised release, it does *not* grant the BOP authority to reduce or shorten a prisoner's term of supervised release.").  Because this Court rejects Defendant's argument that it must apply his earned time credits to his period of supervised release, this Court will proceed to consideration of whether analysis of the § 3553(a) factors justifies early termination.

### c. The Relevant § 3553(a) Factors Weigh Against Early Termination

Addressing one of the § 3553(a) factors, Defendant states that "his sentence is disproportionately greatly than numerous

individuals since convicted of [actual] physical, political violence on January 6, 2021."  (Id. at ¶ 28).

Defendant avers that he has not violated any terms of his supervised release, has abstained from drugs and alcohol, and has met all of the conditions of his release.  (Id. at ¶ 24).

He states that "the United States submitted an 'erroneous, unlawful report inconsistent with multiple Army regulations' regarding Mr. Brodie's military discharge to unfairly disparage Mr. Brodie's character and prognosis."  (Id. at ¶ 29).

Finally, he states that he seeks to renounce his American citizenship in order to move to Israel and obtain citizenship in Israel, which he is unable to do under supervised release as "his current status prevents him from traveling freely or renouncing his American citizenship."  (Id. at ¶ 34).

In his Reply, Defendant also explains that he has repented, and has "a great relationship with Congressman Matt Cartwright's VA liaison Tyler McAlpine (a former Marine himself) for more than 6 months."  (ECF 208 at 7).  He states that his "true character demonstrates that the offense of conviction was a complete aberration and not representative of [his] inherent values."  (Id.).  The Government argues that "[t]aking into consideration Brodie's past threatening and criminal conduct, the danger he still poses to the community, and the interest of

justice, the early termination of his supervised release is not warranted at this time." (ECF 207 at 11).

All of the factors counseling against modification of the computer monitoring condition set forth above also weigh against early termination of supervised release. As the Court has determined that continuation of Defendant's computer monitoring is appropriate, it necessarily follows that continuation of his supervised release term is appropriate. Rather than repeat the analysis of all of the factors already set out above, this Court will focus on the specific factors and arguments Defendant references in his Motion for Early Termination.

First, Defendant reiterates his position that his sentence is disproportionate, comparing his sentence to "numerous individuals since convicted of [actual] physical, political violence on January 6, 2021." (ECF 205 at ¶ 28). Again, Defendant does not point to any specific cases or sentences. He has not carried his burden of demonstrating that he was disproportionately sentenced compared to others with like convictions and criminal histories.

Next, Defendant points to his characteristics, alleging that "the United States submitted an 'erroneous, unlawful report inconsistent with multiple Army regulations' regarding Mr. Brodie's military discharge to unfairly disparage Mr. Brodie's character and prognosis." (Id. at ¶ 29). Defendant addressed

this during his sentencing hearing.  December 19, 2019 Hr'g Tr.
at 78:1-9.  He further explained at sentencing that he "was
awarded a Good Conduct Medal, an Army Commendation Medal, and an
honorable discharge."  December 19, 2019 Hr'g Tr at 79:11-12.
Thus, this Court considered this point at sentencing in
assessing what sentence of incarceration to impose and the
length and nature of any supervised release to follow.  This
point does not weigh against the determination above that an
analysis of Defendant's characteristics counsels against
terminating supervised release at this time.  See 18 U.S.C. §
3553(a)(1).

Also relevant to his characteristics, the fact that
Defendant has represented that he has a positive relationship
with one member of another Congressman's staff and has for a
period of six months does not counterbalance the other
considerations of Defendant's character that this Court
considered in imposing the sentence and considers now.  One
single positive relationship, for a relatively short period of
time, is insufficient to demonstrate that early termination is
appropriate.  This is especially true where this Court notes
that the breakdown of Defendant's relationship with Congressman
LoBiondo's VA liaison devolved over time as it increased in
acrimony culminating in credible and menacing threats of
violence.  Id.

31

Here, as before, Defendant's statement that he has abided by the conditions of his supervised release and not violated his supervision does not warrant early termination.  As explained above, compliance with conditions of release is insufficient to justify early termination, as defendants are expected and required to meet the conditions of their supervised release. See United States v. Guilliatt, No. 01-408, 2005 WL 589354, at *1 (E.D. Pa. 2005).

Finally, Defendant has not drawn any connection between his desire to renounce his American citizenship in order to move to Israel and obtain citizenship in Israel and application of the § 3553(a) factors.  While this Court acknowledges the fact that Defendant's ability to travel is restricted by his status on supervised release, mere dissatisfaction with the restrictions associated with supervised release does not justify early termination.

**IV.  CONCLUSION**

For the reasons stated above, the Court will deny Defendant's motions.

An appropriate order follows.


Dated: January 18, 2024            s/ Noel L. Hillman
At Camden, New Jersey              NOEL L. HILLMAN, U.S.D.J.


32